IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 17, 2019

**STATE OF TENNESSEE v. PATRICK CARMODY**

**Appeal from the Criminal Court for Hamilton County
No. 285405   Barry A. Steelman, Judge**

_____

**No. E2018-02115-CCA-R3-CD**

_____

A Hamilton County Criminal Court Jury convicted the Appellant, Patrick Carmody, of first degree felony murder and especially aggravated robbery, a Class A felony, and the trial court sentenced him to concurrent terms of life and twenty-two years, respectively. On appeal, the Appellant contends that the evidence is insufficient to support his convictions because the only evidence against him was that of co-conspirators and accomplices and that the trial court erred by allowing the State to introduce evidence about his ownership of a gun. Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ALAN E. GLENN, JJ., joined.

John Allen Brooks (on appeal and at trial), Donna Miller (at motion for new trial hearing), and F. Lee Ortwein (at trial), Chattanooga, Tennessee, for the appellant, Patrick Carmody.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; M. Neal Pinkston, District Attorney General; and Cameron Williams, and Kevin Brown, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

This case relates to the death of twenty-one-year-old Chance LeCroy. In September 2012, the Hamilton County Grand Jury indicted the Appellant and Billy Bob

Partin for first degree felony murder and especially aggravated robbery. The grand jury filed a separate indictment against Ronald Pittman, charging him with facilitation of first degree felony murder and facilitation of especially aggravated robbery. The Appellant proceeded to trial alone in May 2016.

At trial, Officer Johnny Rogers of the Chattanooga Police Department (CPD) testified that on September 9, 2010, he responded to a "shooting call" at a residence on Johnston Terrace. When he arrived, the victim's roommate, Tucker King, was standing in the doorway or on the front porch. Emergency medical personnel began tending to the victim, so Officer Rogers did not go inside the home.

Sergeant James Tate of the CPD testified that he was dispatched to Johnstone Terrace about noon on September 9, 2010, and that Tucker King told him the following: King and the victim worked together at FedEx. They got off work about 8:00 a.m. and rode home together in King's car. At some point, King went to sleep on the couch in the living room. He was awakened by one or two gunshots and saw a man with a gun standing over him. The man was wearing a blue bandana over his face up to his nose, a blue hoodie, and jeans and ordered King to lie face-down on the floor. King did as he was told, and the man put the gun to the back of King's head.

Sergeant Tate testified that he walked through the house and did not see any forced entry. The victim was lying on the floor in his bedroom. The sheets and covers had been "torn off" the bed, and blood was on the victim and the bed. Sergeant Tate said that the room was in "disarray" and that a struggle appeared to have occurred. The victim's girlfriend, Emily Sailors, arrived at the scene, and Sergeant Tate spoke with her. The victim's cellular telephone was missing, so Sergeant Tate contacted the victim's service provider to locate the telephone. Sergeant Tate learned the telephone had been used after the victim's death, and the telephone was traced to a cellphone tower at the intersection of Hixon Pike and Highway 27 and then a cellphone tower at the intersection of Highway 111 and Coke Bowman Road. Sergeant Tate acknowledged that the telephone traveled toward Soddy Daisy and into the Flat Top Mountain area.

Sergeant Tate testified that the police were unable to develop any suspects. In the fall of 2010, a police officer received information from a woman named Diane Cantrell. Cantrell did not know the victim but thought she had information about his death. From Cantrell's information, the police developed Billy Bob Partin as a suspect. The police began investigating Partin and learned about Ronald Pittman, who was Partin's supervisor. On January 21, 2011, Sergeant Tate interviewed Pittman. Pittman waived his rights and spoke with Sergeant Tate but did not give Sergeant Tate any information about the victim. On cross-examination, Sergeant Tate testified that the names of Jamie Ables and Corrie Wiggins "came up" during his investigation but that "nothing ever panned out as far as them actually being suspects."

- 2 -

Investigator Gregory Mardis of the CPD testified that he responded to the scene on September 9, 2010. He did not see any evidence of forced entry and went to the victim's bedroom in the rear of the house. Investigator Mardis said that the bedroom was "extremely disrupted" and that "it was obvious that a struggle had taken place." Bloodstains were on a pillow, and "a pretty thick wad of hair" was on the bed. The victim was lying on his back on the floor. His head was near the foot of the bed, and his feet extended into a small closet. Two safes were inside the closet, and the door to one of the safes was open. A small pill bottle was in the open safe, and the bottle appeared to contain a small amount of marijuana.

Investigator Mardis testified that the police swabbed the safes, the home's interior and exterior doors, and the victim's body for DNA. The police also swabbed blood splatters on the bedroom walls. Investigator Mardis found the magazine for a .45-caliber Llama handgun behind the bedroom door, and the magazine contained nine rounds. He also found a bullet hole in the baseboard of the room, and he cut a bullet out of the baseboard. A .45-caliber Remington shell casing was on the floor near the victim's body.

Twenty-seven-year-old Tucker King testified that in September 2010, he lived in a home on Johnston Terrace with his older brother and the victim. King and the victim had attended middle school together, and King had known the victim for ten years. The victim's girlfriend, Emily Sailors, often spent the night with the victim. King said that the victim and Sailors sold marijuana from the house and that the victim kept the marijuana in a safe in the victim's bedroom closet. King never knew the victim to have a weapon.

King testified that he and the victim worked together at FedEx and that they usually worked from 3:00 a.m. to 8:00 a.m. On September 9, 2010, King and the victim left for work about 2:30 a.m. King said that "[n]othing out of the ordinary" occurred at work and that they returned home at 8:30 or 9:00 a.m. The victim went to bed, and King "laid down on the couch [in the living room] to watch television." King fell asleep but was awakened by a "[l]oud pop" and saw a man in the kitchen pointing a semiautomatic pistol at him. The man was Caucasian, was "stocky and average height," and was wearing a dark blue hoodie. The man told King to "get on the ground," and King noticed the man had "a very thick Southern drawl." King got face-down on the floor and put his hands behind his back.

King testified that the man put the muzzle of the gun to the back of King's head and that the man said, "'Don't move, I ought to kill you right now.'" King then heard "what sounded like a struggle in the back" and another gunshot. There was silence, and King heard another man say, "'We got it.'" King heard "foot traffic" and a "loud truck" crank outside. King looked out the window and saw "a bluish-gray older truck" leaving the scene. He said that the truck was probably a "70s or 80s" model and that two or three people were in the vehicle. King put on his shoes, went to the victim's bedroom, and

- 3 -

found the victim lying on the floor. King rolled the victim over and called 911. He performed CPR on the victim, but the victim never regained consciousness.

On cross-examination, King testified that the victim sold marijuana "mostly to close friends." The man who ordered King onto the floor may have been wearing a bandana across his face. King said he thought the man was going to kill him.

Emily Sailors testified that she began dating the victim in October 2009 and that she spent four of five nights per week with him at the house on Johnston Terrace. Sailors and the victim sold marijuana out of the house, and they kept the marijuana in safes in the victim's bedroom closet. Sailors said that they usually had "an ounce or two at a time" and that the victim sold one to three and one-half grams at a time. Manny Alcantara was the victim's friend and one of the victim's customers. Sailors said the victim did not own a gun.

Sailors testified that she spent the night of September 8, 2010, with the victim and that the victim left for work in the early morning hours of September 9. When the victim returned home, he and Sailors ate breakfast and watched television. The victim went to bed, and Sailors left for work about 10:30 a.m. At some point, Sailors spoke with Tucker King on the telephone and learned the victim was deceased. Sailors drove to the house on Johnston Terrace and spoke with the police.

Special Agent Mike Turbeville of the Tennessee Bureau of Investigation (TBI) Crime Laboratory testified as an expert in forensic biology and serology that he analyzed the evidence collected in 2010 and compared the evidence to DNA samples from the victim, Tucker King, and a man named James Edwards. Agent Turbeville found blood on the base plate of the .45-caliber magazine, and the DNA profile for the blood was a mixture of the victim, who was the major contributor, and an unknown minor contributor. Agent Turbeville excluded King and Edwards as the minor contributor.

Agent Turbeville testified that the victim's blood was on the victim's bedroom walls. A swab of the victim's bedroom closet was positive for blood, and the blood was a mixture of two individuals with the victim being the major contributor and an unknown female being the minor contributor. Agent Turbeville found DNA on the open safe in the victim's closet, and the DNA profile was that of two individuals. Blood was on fingernail clippings collected from the victim, and the blood contained a mixture of DNA from the victim and an unknown female.

Agent Turbeville testified that in September 2012, he received buccal swabs from the Appellant, Ronald Pittman, Billy Bob Partin, and Emily Sailors. He also received a carpet sample collected on Baywood Drive. Agent Turbeville compared the DNA profiles from the Appellant, Pittman, Partin, and Sailors to the DNA profiles obtained from his previous analysis. Agent Turbeville excluded the Appellant, Pittman, and

- 4 -

Partin, as the minor contributor of the blood on the gun magazine's base plate and the blood in the victim's closet; however, he could not exclude Sailors. The DNA on the open safe in the victim's closet and the blood on the victim's fingernail clippings contained a mixture of the victim's and Sailors' DNA.

Agent Turbeville testified that he visually inspected and tested the carpet for blood but did not find any blood. He said that if the carpet had been outside for an extended period of time, DNA or blood evidence could have been destroyed. The TBI tested a plant-like substance that was in a pill bottle, and the substance was marijuana.

Investigator Christopher Blackwell of the CPD's Major Crimes and Homicide Unit testified that in May 2012, Emily Sailors reported to the police that she had overheard three women discussing the victim's death. Those women were Brittany Davenport, Casey Mitchell, and Ashton Knowles. Investigator Blackwell took over the investigation from Sergeant Tate and spoke with the women, whose stories were very similar. Based on their information, Investigator Blackwell and two officers went to the Harbor Lights Marina on May 23, 2012. Investigator Blackwell explained that in 2010, Josh Dawson and the Appellant lived at the marina. Dawson lived in apartment H-10 on Geneva Trail, and the Appellant lived in cabin 4 on Baywood Drive.

Investigator Blackwell testified that according to Knowles, a vehicle had been burned in a field in the area. Therefore, when the officers arrived at the marina on May 23, they "drove around" looking for the burned vehicle. They found it in a field on Baywood Drive near cabin 4. One of the officers walked along a trail beside cabin 4 and found a piece of rolled-up carpet about one hundred fifty yards from the cabin. They also found a "burn pit" in a small field directly across from cabin 4 but did not recover any evidence from the burn pit.

Investigator Blackwell testified that he contacted the marina property manager, Eddie Holloway, and that Holloway came out to where the officers were located. Investigator Blackwell told Holloway they were there to investigate an incident that occurred in 2010, and Holloway responded, "'September 9th.'" Investigator Blackwell said that he and the other officers were "kind of taken aback" and that they told Holloway, "'Yes.'" Holloway told the officers that they were "going in the right direction" and took them to apartment H-10. When Investigator Holloway walked into the apartment, he noticed two different colors of carpet.

Investigator Blackwell testified that Holloway then took the officers to a vacant house at the end of Dividing Ridge Cemetery Road. The officers found spray cans of gray primer paint inside the house and found a Tennessee license plate about ten feet into the woods. Investigator Blackwell had dispatch "run the tag" and learned the license plate was registered to a 1982 blue C-10 pickup truck. The vehicle had been reported stolen in August 2010.

Investigator Blackwell testified that a couple of days later, he returned to apartment H-10 and measured the dimensions of the different-colored carpet to determine if it matched the dimensions of the rolled-up carpet found on the trail. The dimensions matched.

Investigator Blackwell testified that during his investigation, he learned that on the day of the victim's death, the suspects had stopped at Academy Sports before going to the victim's home. On May 25, 2012, Investigator Blackwell spoke with John Rainey from Academy Sports and requested that Rainey search for a transaction that occurred on the morning of September 9, 2010. Rainey found a transaction for the purchase of a baseball cap, a box of Monarch .380 ammunition, and three balaclavas. The items were purchased at 11:15 a.m. Investigator Blackwell described balaclavas as "think of a ninja. You know, the things that you pull over your head that only allow [your eyes] to be exposed." Investigator Blackwell noted that the victim was killed about noon and that the medical examiner had collected a .380 round from the victim during the victim's autopsy.

Investigator Blackwell testified that on June 14, 2012, he arrested Billy Bob Partin and Ronald Pittman and issued an arrest warrant for the Appellant. Pittman waived his rights and spoke with Investigator Blackwell. Based on Pittman's information, the police collected a 9-millimeter handgun from Pittman's home in South Pittsburg. Investigator Blackwell stated that he charged Partin and the Appellant with first degree felony murder and especially aggravated robbery and charged Pittman with facilitation of first degree felony murder and facilitation of especially aggravated robbery. Investigator Blackwell said he charged Pittman with facilitation because Pittman claimed he never entered the victim's bedroom on September 9, 2010.

On cross-examination, Investigator Blackwell testified that the burn pit was forty to fifty yards from cabin 4 and that the burn pit contained ashes and unburned tree limbs. Investigator Blackwell acknowledged that during his interview with Pittman, he told Pittman that Pittman needed to be honest with him if Pittman did not want to spend the rest of his life in prison.

John Rainey testified that in May 2012, he was a senior regional investigations manager for Academy Sports and was asked by the CPD to search for a transaction involving the sale of three hoodies and ammunition that occurred on the morning of September 9, 2010. Rainey conducted a "simple string search" and found that someone had purchased gray duct tape, two bottles of Gatorade, Monarch .380 ammunition, a "Magellan camo trim distressed cap," and three fleece balaclavas at the Hixson store. The buyer paid $50.90 in cash.

Manuel "Manny" Alcantara testified that in 2010, he worked at the Harbor Lights Marina "around [the] Soddy Daisy area north of Hixson" and lived on Geneva Trail.

Ronald Pittman, Billy Bob Partin, Eddie Holloway, and Josh Dawson also worked at the marina, and Pittman was Alcantara's supervisor. The Appellant lived at the marina, and the Appellant and Pittman were friends.

Alcantara testified that he and the victim were friends and that he would purchase marijuana from the victim once or twice per week. Alcantara would go to the victim's house to buy the marijuana, and he usually went into the victim's bedroom. However, he did not know where the victim kept the marijuana. Alcantara would take Josh Dawson with him sometimes, and Alcantara asked the victim at least twice about buying a large amount of marijuana for Pittman.

Alcantara testified that Partin had a gold-colored car and "an old Chevy" truck. The truck was navy blue but "turned gray." Alcantara said that he went to the Appellant's cabin "quite often" and that he saw the Appellant in possession of a semiautomatic firearm. Alcantara owned a .380 semiautomatic pistol. He said that he did not know the caliber of the Appellant's gun but that the Appellant's gun was "bigger" than his .380 pistol.

Eddie Holloway testified that he was the current property manager at Harbor Lights Marina. In 2010, Ronald Pittman was the property manager and Holloway's supervisor. Josh Dawson, Manny Alcantara, and Billy Bob Partin also worked at the marina. The Appellant did not work there but lived in one of the cabins, and the Appellant and Pittman were friends. Partin had a 1970's or 1980's Chevrolet C-10 truck. The truck did not have an ignition switch, so Holloway assumed the truck was stolen. He asked Partin about the truck, but Partin told him "not to worry about the truck, it was none of [his] business." Holloway said that the truck was dark blue but that the color changed to "gray primer."

Holloway testified that about 10:30 a.m. on September 9, 2020, he saw Partin, Pittman, and the Appellant in the truck. Holloway spoke with them and went to work. About 12:00 p.m., Holloway and Dawson were in Dawson's apartment, H-10. Holloway said that the Appellant came into the apartment and that the Appellant's upper body was "covered in blood." The Appellant went directly to Dawson's bathroom and left "a blood trail of footsteps" on the carpet. The Appellant did not say anything to anyone. He took a shower and came out of the bathroom carrying a bundle of clothes wrapped in a towel. Holloway said he later saw that a section of carpet in H-10 had been "cut out" and that a new section of carpet had been installed. He said that he did not participate in replacing the carpet and that he did not know who replaced it. Holloway never saw Partin's truck again. A few days before the victim's death, Partin had tried to sell Holloway a .380 firearm.

On cross-examination, Holloway acknowledged that he heard a loud truck drop off the Appellant at Dawson's apartment on September 9 and that the truck sounded like

Partin's truck. The Appellant came into the apartment, took a shower, and left the apartment wearing only a towel. Holloway never contacted the police. He said Partin, Pittman, and the Appellant threatened to harm him if he told anyone about what he had seen.

Ronald Lee Pittman acknowledged that the grand jury indicted him for facilitation of first degree felony murder and facilitation of especially aggravated robbery but that he could have been charged with first degree felony murder and especially aggravated robbery for his participation in the victim's death. Pittman said that the State had not made any offers to him in exchange for his testimony and that he did not know what sentences he would receive. He acknowledged, though, that he was hoping for "some consideration" in exchange for his truthful testimony.

Pittman testified that he worked at Harbor Lights Marina in 2010 but that he stopped working there a couple of days after the victim's death because he "couldn't handle what was going on there." Pittman explained that in 2010, Eddie Holloway, Manny Alcantara, Josh Dawson, and Billy Bob Partin also worked at the marina and that he was their supervisor. Pittman had met the Appellant in high school in 1984, and they were friends. In 2010, the Appellant moved into a cabin at the marina.

Pittman testified that Partin had a blue truck and that Partin claimed he stole the truck "from a guy in New Hope." Partin spray-painted the truck with gray primer paint.

Pittman testified that Alcantara and Holloway would go to the victim's house and buy marijuana and that the two of them showed Partin where the victim lived. Alcantara and Holloway told Partin that the victim had a pound of marijuana and some money in a safe. On the morning of September 9, Partin wanted to go to the victim's house to take the victim's money and drugs. Pittman agreed to go with Partin. Pittman, who was driving Partin's gold car, met Partin and the Appellant, who were in Partin's gray truck, in the parking lot of Academy Sports. Pittman went inside Academy Sports and bought a roll of duct tape, two bottles of Gatorade, .380 ammunition, two masks, and a "ball cap." Pittman, driving Partin's car, then followed Partin and the Appellant, who were still in the truck, to a McDonald's parking lot. Pittman got into the truck, and Partin drove to the victim's house. Pittman said all three of them were armed: Pittman had "[a] .9 millimeter," the Appellant had "a .45," and Partin had "a .380." Pittman said that Partin "was just going to go in and get the safes and we were going to leave." The State asked Pittman why they were armed if they were just going to take the victim's safes and leave, and Pittman answered, "Haven't a clue, sir."

Pittman testified that when they arrived at the victim's house, Partin went inside while Pittman and the Appellant waited in the truck. Partin came outside and told them that two men were inside the house and that the men were asleep. Partin, the Appellant, and Pittman went inside the home. Pittman and the Appellant were wearing masks and

- 8 -

gloves, and Partin was wearing a ball cap. Partin and the Appellant went to the back of the house, and Pittman stayed in the kitchen. Tucker King was asleep on the living room couch. Pittman said that "it [started] getting loud back there," that he "heard a commotion," and that he heard a gunshot. King awoke, so Pittman walked over to him and told him to "lay down." Pittman heard a second gunshot, and Partin came from the back of the house and said, "'Come on, we're leaving we're leaving.'" Pittman, the Appellant, and Partin went outside and got back into Partin's truck. Pittman and Partin did not have any blood on them, but the Appellant was "[c]overed" in blood. Pittman said he was "panicking" because he was "scared to death" of the Appellant.

Pittman testified that Partin drove back to the McDonald's parking lot and that Pittman and the Appellant got into Partin's gold car. Partin left the parking lot in the truck and said that he was "taking it to the mountain." Pittman and the Appellant drove back to the marina and stopped at Dawson's apartment. The Appellant went into Dawson's apartment and took a shower while Pittman stood outside. Pittman and Dawson then went to Pittman's apartment. Later, Pittman went to the Appellant's cabin. The Appellant had "built a fire" and was burning his clothes. Pittman threw his mask and sweatshirt into the fire.

Pittman testified that while they were standing by the fire, the Appellant told him the following: The Appellant beat the victim's head and face with the butt of the Appellant's gun. The Appellant hit the victim so hard that the gun "clip" came out of the gun, leaving one round in the chamber. The Appellant shot the victim one time. However, the victim was "still trying to get on" the Appellant, so Partin shot the victim with his .380 firearm.

Pittman testified that the Appellant left blood on the carpet in Dawson's apartment, so the carpet was "cut up" and thrown away. In 2011, Pittman spoke with Sergeant Tate. He did not tell Sergeant Tate about what had happened on September 9, 2010, because Partin had threatened him. Pittman said that in June 2012, he told Investigator Blackwell the truth about the victim's death because "I was tired of the threats and tired of living with it. I couldn't live with it no more."

On cross-examination, Pittman testified that he had not heard of any plan to rob the victim prior to September 9, 2010. Pittman said that he smoked marijuana in 2010 but that he never bought marijuana from the victim and that he never tried to buy a pound of marijuana from the victim. He said it was "possible," though, that he asked Alcantara to buy him some marijuana from the victim. He said he did not know the victim and did not know where the victim lived prior to September 9. Partin knew where the victim lived because Alcantara and Holloway had taken Partin "up there a few times." Pittman said Alcantara and Holloway knew a robbery was going to occur.

Pittman testified that he bought two masks, not three, at Academy Sports. He said he did not buy Partin a mask because Partin told him, "'Just get me a hat.'" After making the purchase at Academy Sports, Pittman, Partin, and the Appellant drove to the victim's home. Partin went inside, came back outside to the truck, and wanted to leave because two men were in the house. The Appellant responded, "'No, we're here, we're doing it, let's get out.'" Partin entered the home first, followed by the Appellant and Pittman. Partin and the Appellant went to the back of the house while Pittman waited in the kitchen. Pittman acknowledged that he pointed his gun at Tucker King, that he ordered King onto the floor, and that he put the gun to the back of King's head. He said he did not think he told King, "'I ought to kill you.'" When Partin emerged from the back of the house, Partin did not say, "'[W]e got it.'" Instead, Partin simply said, "Let's go."

Pittman testified that Holloway replaced the bloodstained carpet in Dawson's apartment and that Partin disposed of the gray truck. Pittman said he lied to Sergeant Tate in January 2011 because Partin and the Appellant had threatened him. After Pittman was arrested in this case, he spent six months in jail and was released on "house arrest." Pittman acknowledged that he violated house arrest several times in that he went to Shoney's without permission, was arrested for intimidating an auxiliary officer, and went to the Marion County Jail without permission in order to get his mother out of jail. Pittman said that he also had a prior conviction for theft but that the conviction was expunged. He explained that the conviction resulted from his removing a boat from a boat slip at the marina because the owner had failed to pay the rent. Pittman denied that he was fired from the marina for the theft and said that he quit working there because he was scared. Pittman said he did not commit first degree murder in this case because "I didn't shoot anyone." He acknowledged that he hoped to receive probation in exchange for his testimony but said that he was testifying "[t]o make things right." He stated that he had "made mistakes" in his life but that he was not a danger to the community.

Special Agent Shelly Betts of the TBI testified as an expert in firearms identification that in 2010, she analyzed evidence in this case. The cartridge case found on the victim's bedroom floor was a Remington Peters ".45 auto caliber fired cartridge case." The bullet collected from the baseboard in the victim's bedroom was a "fired .45 auto caliber bullet." Agent Betts did not receive a .45-caliber firearm for analysis. However, she said that Llama and some other gun manufacturers produced firearms with the same rifling characteristics as the bullet.

Agent Betts testified that the gun magazine found behind the victim's bedroom door was marked "'Llama .45 auto.'" Agent Betts said that the magazine was "in parts" when she received it and that the base plate of the magazine was "flush" with the body of the magazine so that a person would have had difficulty pulling the magazine out of the gun. She said that the base of the magazine was "different than anything [she] had seen before" and that, in her opinion, the magazine fell out of the gun when someone pressed the magazine release button. The magazine could hold ten cartridges but contained only

nine cartridges. Four of those nine cartridges were manufactured by Remington Peters and had the same "RP head stamp" as the fired cartridge case found on the floor. Agent Betts said most guns with one round in the chamber could fire a bullet without the magazine in the gun.

Agent Betts testified that the bullet removed from the victim during his autopsy was a ".380 auto caliber bullet" and that the rifling characteristics on the bullet were consistent with firearms manufactured by Davis and Cobra. After Agent Betts completed her analysis of the evidence, she returned the evidence to the CPD. In 2012, the CPD sent the bullet recovered from the victim back to her along with a new box of Monarch .380 ammunition. Agent Betts compared the bullet from the victim to the Monarch ammunition and determined that they were not identical. However, the bullet from the victim and the bullets in the Monarch box were full metal bullets, had the same weight, and appeared to have been manufactured by Prvi Partizan.

Dr. James Kenneth Metcalfe, the Chief Medical Examiner for Hamilton County, testified as an expert in forensic pathology about the victim's autopsy report. The victim weighed one hundred eighty-four pounds and was six feet tall. He was shot twice. One bullet entered the front of the victim's left shoulder. The bullet traveled front to back, left to right, and downward. It traveled through both of the victim's lungs, traveled between his heart and aorta, and exited his right back. Dr. Metcalfe said that the victim would have been able to move after he was shot.

Dr. Metcalfe testified that another bullet entered the left side of the victim's back. The bullet traveled back to front, left to right, and downward. The bullet struck the victim's heart and lungs, struck his diaphragm, and grazed the top of his liver. The bullet stopped under the victim's skin and was removed during his autopsy. Dr. Metcalfe stated that the victim could have stayed alive one or two minutes with his heart wound. Stippling was around both of the gunshot entrance wounds, meaning the muzzle of the gun was less than two feet from the victim when the gun was fired.

Dr. Metcalfe testified that in addition to the victim's gunshot wounds, he also had lacerations on the left side of his head. Dr. Metcalfe acknowledged that the lacerations could have been caused by the butt of a gun. The victim also had an abrasion on his head and a laceration on the back of his head. Dr. Metcalfe said that all of the wounds were "curved" and that they could have been caused by the same object. The victim had thirteen or fourteen additional abrasions on his body, including abrasions on the back of his left hand. The victim's blood tested positive for marijuana. Dr. Metcalfe said that the victim's cause of death was multiple gunshot wounds and that his manner of death was homicide.

On cross-examination, Dr. Metcalfe testified that only one bullet was recovered from the victim and that the same weapon could have caused both gunshot wounds. He

said the abrasions on the back of the victim's hand could have been offensive wounds. The victim also had a basal fracture to his skull. At the conclusion of Dr. Metcalfe's testimony, the State rested its case.

Ashton Knowles testified for the Appellant that her best friend was married to Eddie Holloway and that Knowles lived with them at Harbor Lights Marina in 2012. Holloway told Knowles that Ronald Pittman shot the victim, burned Partin's truck, and "threw the gun in the lake." Knowles spoke with the police twice. In her first statement to the police, Knowles did not tell the police that she got her information from Holloway. Knowles said she was not honest with the police because she was afraid Pittman would harm her best friend and her best friend's children. Pittman was Holloway's supervisor, and Holloway "acted afraid" of Pittman.

Josh Dawson testified that at the time of the Appellant's trial, he was dating and living with Ronald Pittman's daughter and that he considered Pittman to be a close friend. Dawson started working for Pittman at Harbor Lights Marina in 2009 or 2010 and moved into apartment H-10. Manny Alcantara also worked there, and Dawson knew the victim because the victim was "Manny's friend." Dawson never went with Alcantara to buy marijuana from the victim.

Dawson testified that Billy Bob Partin had a truck and that Partin claimed he bought the truck from someone in Monteagle. Partin did not have a license plate or a key for the truck, so Dawson suspected the truck was stolen. At some point, Pittman told Dawson to paint the truck, so Dawson helped Partin paint the truck gray. On September 9, 2010, Dawson saw Pittman, Partin, and the Appellant drive by in the gray truck. At lunchtime, Dawson went to his apartment and noticed Partin's gold car was parked there. Dawson did not see the gray truck. Dawson said that Pittman and Partin were standing outside and that the Appellant was taking a shower in Dawson's apartment. Dawson did not see anyone else in the apartment. Dawson was upset about the men being there and left with Pittman. Dawson later spoke with the police. He said he did not tell the police the truth because he had been threatened. On cross-examination, Dawson testified that the Appellant had threatened him.

At the conclusion of Dawson's testimony, the Appellant rested his case. The jury convicted the Appellant as charged of first degree felony murder and especially aggravated robbery, and the trial court immediately sentenced him to life in prison for the murder conviction. After a sentencing hearing, the trial court sentenced him to twenty-two years for especially aggravated robbery and ordered that the sentence be served concurrently with the life sentence.

## II. Analysis

### A. Sufficiency of the Evidence

The Appellant contends that the evidence is insufficient to support his convictions because the only evidence against him was that of co-conspirators and accomplices. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

As charged in this case, first degree felony murder is "[the] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." Tenn. Code Ann. § 39-13-202(a)(2). A person commits especially aggravated robbery who intentionally or knowingly takes property from another by violence or by putting the victim in fear, the person uses a deadly weapon to accomplish the robbery, and the victim suffers serious bodily injury. Tenn. Code Ann. §§ 39-13-401(a), -403.

"[A] conviction may not be based solely upon the uncorroborated testimony of an accomplice." State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001). As our supreme court has explained,

"[T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration."

State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994) (quoting State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992)). "Whether sufficient corroboration exists is a determination for the jury." Shaw, 37 S.W.3d at 903.

Here, Ronald Pittman testified as follows: On the morning of September 9, 2010, he agreed to go with Billy Bob Partin to rob the victim of the victim's money and marijuana. Pittman drove Partin's gold car to Academy Sports where he met Partin and the Appellant in Partin's gray truck. Pittman went into the store and bought masks for himself and the Appellant, a hat for Pittman, and .380 ammunition. He then followed Partin and the Appellant to a McDonalds parking lot and got into Partin's truck. Manny Alcantara had shown Partin where the victim lived, so Partin drove to the victim's home on Johnstone Terrace. Partin went into the home, found the victim and Tucker King sleeping, and returned to his truck. Partin, the Appellant, and Pittman then entered the home. Partin was armed with a .380-caliber firearm, the Appellant was armed with a .45-caliber firearm, and Pittman was armed with a 9-millimeter firearm. Partin and the Appellant went to the victim's bedroom while Pittman waited in the kitchen where he could see King sleeping. Pittman heard a "commotion" and a gunshot, which woke King. Pittman pointed his gun at King, told King to get onto the floor, and put his gun to the back of King's head. Pittman heard a second gunshot, and Partin emerged from the victim's bedroom and told Pittman, "'Let's go.'" Partin, Pittman, and the Appellant got back into Partin's truck, and Partin returned to the McDonald's parking lot. Pittman and the Appellant got into Partin's gold car, and Pittman drove to Josh Dawson's apartment. The Appellant, who was "covered" in blood, went inside the apartment to take a shower and left blood on Dawson's carpet. Later, Pittman went to the Appellant's cabin and found the Appellant burning the Appellant's clothes. The Appellant told Pittman that he beat the victim with the butt of his gun and that he hit the victim so hard the magazine came out of the gun, leaving one round in the chamber. The Appellant told Pittman that

he shot the victim, that the victim continued to fight him, and that Partin shot the victim. Pittman said the bloody carpet in Dawson's apartment was "cut up" and thrown away.

Pittman's testimony was well-corroborated. Eddie Holloway testified that on the morning of September 9, he saw Partin, Pittman, and the Appellant in Partin's truck. John Rainey from Academy Sports found a receipt for the purchase of three balaclavas, a hat, and .380 ammunition at the Hixson store at 11:15 a.m. King testified that he was awakened by a gunshot, that he saw a man with a semiautomatic pistol in the kitchen, and that the man pointed the gun at him. King also testified that the man made him get onto the floor and that the man put the gun to the back of his head. King heard a second gunshot, heard another man say "we got it," and heard "foot traffic." King looked outside and saw a bluish-gray truck leaving the scene with two or three people in the truck. Holloway testified that he was in Dawson's apartment about noon and that the Appellant, whose upper body was "covered in blood," came into the apartment. Holloway said that the Appellant left a trail of bloody footprints on the carpet, that the Appellant took a shower, and that the Appellant left the apartment carrying a bundle of clothes wrapped in a towel.

Investigator Mardis testified that the victim's bedroom was in disarray and that a struggle obviously had taken place. He found a .45-caliber shell casing near the victim and found a .45-caliber gun magazine behind the door of the victim's bedroom. The victim was known to keep his marijuana in a safe in his bedroom closet, and Sergeant Tate saw an open safe in the closet containing only a small amount of marijuana. The victim's autopsy showed that he had been shot twice. Sergeant Tate removed a .45-caliber bullet from the baseboard in the victim's bedroom, and a .380-caliber bullet was removed from the victim during his autopsy. Investigator Blackwell found a roll of carpet near the Appellant's cabin, and the dimensions of the carpet matched the dimensions of the carpet that had been replaced in Dawson's apartment.

During closing arguments, defense counsel argued that Pittman, Alcantara, Josh Dawson, and Holloway were friends, that all of them were involved in the robbery and death of the victim, and that "their stories are different because they're pure lies." However, Dawson, the Appellant's own witness, testified that he saw Partin, Pittman, and the Appellant in Partin's truck on the morning of the victim's death and that he returned to his apartment at lunchtime to find Partin's gold car parked outside and the Appellant taking a shower. From the evidence presented at trial, we have no hesitation in concluding that the evidence is sufficient to support the Appellant's convictions.

## B. Gun Ownership

The Appellant contends that the trial court erred by allowing the State to introduce evidence about the Appellant's alleged ownership of a gun because the evidence was

inadmissible pursuant to Tennessee Rule of Evidence 404(b). The State argues that the trial court properly allowed the evidence. We agree with the State.

Prior to Manny Alcantara's testimony, the State requested a hearing pursuant to Tennessee Rule of Evidence 404(b) because Alcantara was going to testify that "he had seen Mr. Carmody with a gun, a large caliber gun, previous." During the jury-out hearing, Alcantara testified that in the summer of 2010, he went to the Appellant's cabin and saw the Appellant holding a black, semiautomatic pistol. Alcantara said he did not know the caliber of the Appellant's gun. Alcantara stated, though, that he owned a .380 semiautomatic gun and that the Appellant's gun "was a larger gun than my .380" and "had a longer barrel." On cross-examination, Alcantara testified that he saw the Appellant with the gun in July or August 2010. Ronald Pittman testified in the jury-out hearing that the Appellant was armed with a ".45 automatic" when Pittman, the Appellant, and Partin entered the victim's home.

The trial court questioned whether it should analyze the admissibility of Alcantara's testimony under Rule 404(b) because possession of a firearm was not a criminal offense. The State advised the trial court that the Appellant was a convicted felon when he possessed the gun; therefore, his possession of the gun was a crime. The State noted that if the Appellant testified, the jury may learn about his prior conviction and requested that the trial court analyze the admissibility of the evidence as a prior bad act pursuant to Rule 404(b). The State argued that because one of the perpetrators "left behind" a .45-caliber magazine in the victim's bedroom, Alcantara's testimony was relevant to show the Appellant's identity.

The trial court found that the Appellant's possession of a gun within two months of the victim's death was relevant under Tennessee Rule of Evidence 401 and that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice as required by Tennessee Rule of Evidence 403. Pursuant to Tennessee Rule of Evidence 404(b), the trial court found that the Appellant's possession of a weapon larger than a .380 firearm was relevant to establish his identity as the person who possessed a .45-caliber firearm in the victim's bedroom and that the probative value of the evidence was not outweighed by the danger of unfair prejudice. Accordingly, the trial court ruled that Alcantara's testimony was admissible.

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Generally, "[a]ll relevant evidence is admissible except as [otherwise] provided . . . . Evidence which is not relevant is not admissible." Tenn. R. Evid. 402. However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of

undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Tennessee Rule of Evidence 404 provides:

(b) Other Crimes, Wrongs, or Acts. - Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). If the trial court has complied with these procedures, this court will not overturn the trial court's decision to admit or exclude evidence under Rule 404(b) absent an abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). Generally, "[o]nly in an exceptional case will another crime, wrong, or bad act be relevant to an issue other than the accused's character. Such exceptional cases include identity, intent, motive, opportunity, or rebuttal of mistake or accident." State v. Luellen, 867 S.W.2d 736, 740 (Tenn. Crim. App. 1992)

Initially, we note that the trial court analyzed the admissibility of Alcantara's testimony under Rule 403 and Rule 404(b). The State argues that the Appellant's possession of the gun was not prohibited by Rule 404(b) because "[possession of] a .45 caliber semiautomatic handgun, standing alone, was not a crime." Ordinarily, we would agree with the State. See State v. Reid, 213 S.W.33d 792, 814 (Tenn. 2006). In this case, though, the State requested that the trial court analyze the issue pursuant to Rule 404(b) due to the Appellant's being a convicted felon. Therefore, we will consider whether the trial court properly determined that the evidence was admissible under Rule 404(b) "for other purposes." We note that the test in Rule 404(b) for balancing probative value

against prejudicial effect is more stringent than the test set forth in Rule 403. See State v. DuBose, 953 S.W.2d 649, 654 (Tenn. 1997).

The trial court complied with the procedure outlined in Rule 404(b). During a jury-out hearing, the trial court found that a material issue existed other than conforming with a character trait, namely the Appellant's identity as the person who possessed the .45-caliber gun in the victim's bedroom. Although the trial court did not specifically address whether it found proof of the other crime, wrong, or act to be clear and convincing, we can infer that the trial court did so. Finally, the trial court found that the probative value of the evidence was not outweighed by the danger of unfair prejudice. We agree with the trial court. Alcantara's testimony that the Appellant possessed a semiautomatic pistol of an unknown caliber was prejudicial to the Appellant. However, given that a .45-caliber shell casing and a .45-caliber magazine were found in the victim's bedroom, the Appellant's possession of a gun larger than a .380 firearm just two months prior to the victim's death was highly relevant to the State's case. Accordingly, we conclude that the trial court did not err by admitting Alcantara's testimony.

## III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE